The next case today is Jean-Clement Mashilingi v. Merrick B. Garland, Appeal No. 20-2169. Attorney Armington, please introduce yourself for the record and proceed with your argument. Good morning, Nicholas Armington. On behalf of Petitioner Jean-Clement Mashilingi and the MPs of the Court, Mr. Mashilingi was tortured and left for dead after reporting on the abuse of children at the hands of a Rwandan government minister and other powerful men with connections to the government in Rwanda. The immigration judge in court's denial of Mr. Mashilingi's asylum application was based on legal error and holding against Mr. Mashilingi the failure to produce certain corroborating evidence before finding that that corroborating evidence was available to Mr. Mashilingi and at the same time discounting certain other corroborating evidence that was in the record. The incredibility finding was not supported by substantial evidence in that it was based on both minor and non-existent inconsistencies. And for these reasons, the decision below should be reversed and remanded. I'd like to first address the corroboration issue. The immigration judge... Um, no, please. Let's start with the credibility issue. Thank you, Your Honor. Thank you, Judge Lowe. Elimination. Judge Lowe, based your finding on non-existent... I'm sorry. Please proceed. Yes. Thank you, Your Honor. The immigration judge based the finding of incredibility on six alleged inconsistencies below, but each are subject to clear explanation or not actually inconsistencies upon examination of the record. The first was a description in the original I-589 of police officers as unknown men, where in the remainder of the record, the police officers are referred to as police officers. This minor discrepancy is subject to the explanation that the original I-589 was prepared by an individual that had a very limited understanding of the English language, and that is shown by the numerous grammatical errors and spelling errors in the application. And further, Mr. Mashalinghi testified below that he did not, when asked by the immigration judge, that he did not tell this individual that they were unknown men that detained him and took him into captivity. Counsel, one thing that troubles me, I understand that Mr. Mashalinghi has explanations for this litany of inconsistencies cited by the immigration judge, but under our precedent, as I understand it, whether or not to accept explanations for inconsistencies is itself a matter to which we give pretty wide deference to the immigration judge. And the immigration judge heard and rejected, as did the board, rejected all of these explanations, so why should we credit him? You are correct that the immigration judge's determination as to credibility is subject to the substantial evidence standard, and that is a deferential standard. However, there need to be actual inconsistencies below to support the incredibility. But there are actual inconsistencies. I mean, I've looked at the record. There are inconsistencies. You attempt to explain them, you attempt to characterize them as minor. But the fact of the matter, even the one that you've started with, which may be your best point, is an inconsistency. There's a clear inconsistency between saying that there are unknown men who accosted me and police officers took me into custody. Yes, Your Honor. While we recognize there are minor inconsistencies, some minor, we rest our arguments as to how they are minor. However, Your Honor, I would argue that notwithstanding an incredibility finding, a determination on whether Mr. Marshalinghi is entitled to relief, an incredibility finding can be rescued by sufficient corroborating evidence. If Mr. Marshalinghi's testimony is incredible, how can his petition for asylum stand? He is the one who has told his story. And if that story is not believed, yes, you have corroboration which wasn't accepted by the immigration judge, bits and pieces of it. But I'm struggling from my reading of the immigration judge's decision, the BIA's decision, and what portions of the record I've looked at so far, with the notion of how, if the adverse credibility determination is sustainable, how the petitioner can prevail. Two points on that, Judge Salia. First, I can direct your attention to page 11 of the decision. This is a case cited in the immigration judge's decision, and quoted in the decision, Ahmed v. Holder, which states the presence of corroboration may save an asylum application, notwithstanding the alien's apparent lack of credibility. That's precisely the situation we have. What are you putting forward that would save it? Well, Your Honor, the voluminous corroborating evidence in the record, and also the fact that the immigration judge and the court held against Mr. Mashalenki the fact that he did not produce four pieces of corroborating evidence without making two explicit findings that this court has found need to be made. But see, that just goes to the posture of this case is not one in which the reason for finding him incredible is a lack of corroboration. The reason for finding him incredible is inconsistencies. And then corroboration could save him. Well, even if the BIA may have erred in concluding that some of what you didn't have was something that you actually couldn't have gotten, it still leaves you in the situation if that incredibility finding needs to be saved, you have to point to something that could save it. And the only affirmative things that you identify are things that, as I understand it, the BIA considered and found wanting, and unless it was wrong in finding them wanting, you still face the problem that even if it erred in thinking you should have had this other stuff that you couldn't get, what do you have that could save it? So as I understand it, all you have pointed to is there's the country condition reports, and I don't mean by saying all that's inherently insufficient. I'm just saying what you pointed to is the country condition reports and the statement from the children. Is that right? And I guess the newspaper article? Yes, sir. So there are four categories of corroboration, the IJ and the BIA required from Mr. Mashalinghi before making two subsidiary findings that are necessary under Song v. Holder. No, no, no. I'm asking you a different question. Forget that point for a second. What have you put forward that you think is corroborating and therefore saves it, notwithstanding the inconsistencies? Yes, Your Honor. There is voluminous corroborating evidence in the record. The sons and daughters' declarations corroborate that Mr. Mashalinghi broke his teeth. They also corroborate that he was arrested by a ruling of the authorities. Secondly, the medical report corroborates the numerous injuries to Mr. Mashalinghi. It corroborates the fact that his thumb nail was in his wrist pocket. It corroborates the fact that he was stabbed with a screwdriver. It corroborates the fact, Your Honor, that his teeth were compacted after his face was shoved into a table. Your Honor, all these injuries are corroborated in the medical report, and, in fact, the medical report finds these injuries consistent with the mechanism of torture that Mr. Mashalinghi described and also finds Mr. Mashalinghi's story credible, given the physician's experience in conducting these sorts of interviews. Third, Your Honor, the country... Excuse me. Is anything that you've just mentioned something that you say that wasn't considered by the IJ and the BIA? Because I think all of those documents were mentioned in one or both of those decisions. Well, Your Honor, we would argue some of those documents were not appropriately considered. The immigration... I didn't say appropriate. I know you'd argue appropriately, but is it true that one or both of those... that all of those documents were mentioned in one or both of the administrative decisions below? We would disagree that the sons and daughters declarations were recognized as the immigration judge found that there were no documents in the record to establish Mr. Mashalinghi worked at TB10 or experienced detention and abused the hands of the Rwandan police, while during the hearing, the immigration judge indicated she would give the sons and daughters the declaration's limited weight. We would argue that, in fact, those declarations were given no weight as the immigration judge's decision indicates that there were no documents in the records during those points, while the declarations do support both those points. I thought that the... She didn't say there were no documents that tended to support. She said there were no documents that established. Wasn't that the word she used? That's correct, Your Honor. There was no recognition that there were any documents tending to establish one way or the other, Your Honor. That's our argument. Counsel, that's time. Can I ask one last question, quickly, to the photograph? Yes. The photograph seems like a problematic fact for you if that photograph was, in fact, taken on the day of the interview. Is there anything in the record that contests whether that photograph was taken then? Your Honor, with respect to the photograph, I'm not aware of anything that contests that that photograph was taken. Okay, thank you. We'll hear from the government. Attorney Armington, please mute your audio and video. Attorney Hurley, please unmute your audio and video. Introduce yourself for the record and proceed with your argument. May it please the Court, James Hurley for the Attorney General. This petition for review should be denied for two reasons. First, the adverse credibility determination is supported by substantial evidence. Both the immigration judge and the Board had specific and cogent reasons for finding Mr. Mashalinghi not credible. And secondly, substantial evidence also supports a denial of CAT protection where his adverse credibility doomed his CAT application and he had no objective evidence that would be his burden of proof for CAT protection. So, in this case, the immigration judge listed I think it was 10 points where she had problems with his evidence. It was either inconsistent or implausible. To the first one that was discussed before, if you go to his initial asylum application, which was filed in February of 2019, it specifically states that unknown men abducted him on the 11th and that he didn't find out until later that they were police. So, it's completely different from what he said before or later on in his written and in his testimony where his written statement from August of 2019 in his testimony where he said, hey, I was pulled up to my house and I saw these policemen in a car and they were not in uniform, but they had guns and they had handcuffs. So, I recognized them even right there on that day on July 11th. And then secondly, there was the whereabouts of his wife. That's a big hole in his case because if you look at different points of time, he said that there was evidence that she was in Texas. When he was first picked up by DHS in March of 2019, he said, I heard my wife was in Texas. And then later on in both his application from February 2019 and from June 2019. So, it just wasn't the application that was prepared by the non-lawyer. It was his first attorney in June 2019 said, I don't know where my wife is. But then later on, he comes back with the affidavit that says, I found out in December 2018 that my wife was in Texas. So, this was before he filed his first asylum application. So, that inconsistency is in the record and it supports the adverse credibility determination in this case. And then if you also look at the non-immigrant visa detail that was cited in this case, where it's a government record that was produced when he first applied for his visa. It showed that he applied in June of 2018, June 14th of 2018, with a story that he was going to go to his son's wedding in Texas. That application happened before any of his other things that he claimed happened. He said that he worked for the TV station and beginning at the end of June 2018, he started, you know, they filmed the students and they made the recording. And then June or July 11th is when the police got him. And then he was held for he was detained for three days at an unknown place. And then he was thrown on the side of the road. He was picked up and then he was in the hospital for five days or he said not less than five days. So this puts him past what he concedes was his interview at the at the U.S. Embassy in Kigali, which was July 16th. So is the timeline is doesn't add up either. The immigration judge asked him about that and he he had no explanation for that. And point blank at the end, which he said, you know, how do you explain this? You apply for this visa in June 2014. Everything happened well after that. And you say that you got together with Mr. Hubert and came up with this after you were released from the hospital. And he said he started kind of grasping for straws and said, well, maybe my wife and Mr. Hubert did this, you know, submitted this visa application in June. And it just it didn't make any sense. And then if you look at the photograph, actually, where the immigration judge got him to, he conceded that it was his photograph. He conceded that, yes, this was taken when I went for my interview for the visa. Again, that was July 16th. And she said, well, there's you know, there's no indication you were held for three days and beaten severely. Your teeth were knocked out. Multiple cuts. You know, you were you know, it was either a boot or a rifle, but that knocked your teeth out. And then actually at the time when you were still supposed to be at the hospital, you showed up to the embassy and then you had this your picture taken. And it's fine. And there was no visible scars. But then five minutes. Then he said, well, you might see a little scar there between, you know, under my nose and above my mouth. So that's another fault in his claim. I don't want to interrupt you if you want to keep going through each one of them. But if you could just address the corroborating evidence, what he claims was corroborating evidence of the doctor's report, how the BIA handled that and how we should think about that. Well, they they thoroughly considered it. They they looked at the evidence, both the DHS attorney asked him about it during the hearing and I followed up with him, too. But there were even more problems there. There was a there was an issue, whether it was his right eye where he had a scar on his left. So they they thoroughly considered it. And they also said that they also found that the whole thing with the with the experts and with his two with his son. And I guess his daughter who was in Canada, his son is in Rwanda and his daughter in Canada. It was he they their claim was just based on his claim. So they kind of parroted his story that he gave that didn't make any sense. So they just kind of amplified that. So the immigration judge considered it and she she said, well, this, you know, this doesn't fit. I think the son's application even kind of echoed the unknown whereabouts of the mother, too. So none of it added up. The immigration judge considered everything. She she asked him to give him an opportunity to explain things. And he and he just he wasn't able to. It is not contesting the physical assessment that the doctor made that there was pretty severe trauma inflicted on him at some point. They didn't get into whether, you know, the the cause of any kind of injuries or they didn't question the expert as to whether, you know, you know, whether she was credible. They they they said that, you know, that they accepted her report or Dr. Jasper Jasper, sorry, his report. But it said but he didn't meet his burden to show that whatever happened, whatever the medical issues in the report were lined up with what is claimed happened. So his whole story was that, you know, I got abducted on July 11th, held for three days, beaten severely, left by the side of the road. And then I I was in the hospital for not less than five days. I mean, it just didn't add up at all. And then his his whole, you know, he said, I got released from hospital. And then I met with my wife's cousin, Mr. Hubert. Gosh, you Gaza. And, you know, he said, oh, you know, within less than a week, he was able to somehow get a visa from the US embassy to go, you know, supposedly see his son. But just the time I didn't add up because he was supposed to be in the hospital on those dates that he said. And it showed and it's followed up in the NIV report where he, you know, he had his interview on the 16th. And then I think it was approved on the 17th. He had his picture that was taken there. He doesn't he doesn't challenge that. And, you know, the bottom line about how he applied for a visa in June, you know, June 14th. And he said all these things happened. His reason for coming happened started two weeks, more than two weeks after he first applied for that. So it just didn't add up. So, OK. Are there further questions? No further questions. The we ask that this court dismiss or not a petition for review. Thank you. Thank you both. Thank you, counsel. That concludes argument. This case, Attorney Armington and Attorney Hurley should disconnect from the hearing at this time.